**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| **FEDERAL DEPOSIT INSURANCE** ) | |
| **CORPORATION AS RECEIVER FOR** ) | |
| **FIRST UNITED BANK,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. _____** |
| ) | |
| **v.** ) | |
| ) | |
| **DONALD BOROWSKI; KEVIN GORMAN;** ) | |
| **WAYNE HAMEISTER; RICHARD** ) | **JURY TRIAL DEMANDED** |
| **LINDEMAN; DONALD OLIVIERI, JR.;** ) | |
| **and DAVID ZEGLIS;** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation ("FDIC") as Receiver for First

United Bank ("FDIC-R"), for its Complaint, states as follows:

## INTRODUCTION

1.     On September 28, 2012, the Illinois Department of Financial and Professional

Regulation closed First United Bank, Crete, Illinois ("First United" or the "Bank"), and

appointed the FDIC-R as Receiver.  In this lawsuit, FDIC-R seeks to recover damages of at least

$8.05 million caused by the negligence, gross negligence, and breaches of fiduciary duty of six

former directors and/or officers of the Bank (the "Defendants") when they, among other things,

approved ten poorly underwritten loans (the "Subject Loans") from September 2007 through

February 2009.

2.     Defendants approved the Subject Loans in derogation of their duties to the Bank by failing to inform themselves of material facts necessary to evaluate the merit of each credit decision, including the repayment ability of the borrower, the financial strength of guarantors, and the sufficiency of underlying collateral to protect the Bank in the event of default. Defendants' approvals of the Subject Loans violated the Bank's Loan Policy ("Loan Policy") and prudent lending standards.  By failing to consider material information and ignoring Loan Policy violations and other underwriting deficiencies when voting to approve loans, Defendants abdicated their responsibilities to ensure that loans were made in accordance with safe and sound banking practices.

3.     Defendants' negligence, gross negligence, and breaches of fiduciary duties in approving the Subject Loans caused damages of not less than $8.05 million.

## THE PARTIES

### A.     Plaintiff

4.     The FDIC is a corporation and an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a), and the FDIC, when acting as Receiver, is charged with the orderly liquidation of failed banks, 12 U.S.C. § 1821(c)(2)(A)(ii).

5.     As First United's receiver, the FDIC-R succeeded to all rights, titles, powers, and privileges of the Bank and, among others, its depositors and accountholders.  12 U.S.C. § 1821(d)(2)(A)(i).  Congress specifically authorized the FDIC, when serving as receiver of closed institutions, to pursue claims against directors and officers of failed banks for breach of the applicable duty of care.  *See* 12 U.S.C. § 1821(k).

**B.** **Defendants**

6. Donald Borowski ("Borowski") was the Bank's Chief Lending Officer ("CLO") from 2005 until 2010.

7. Kevin Gorman ("Gorman") was a member of the Bank's Board of Directors ("Board") from 1994 until 2012 and Chairman of the Board from 2010 until 2012.

8. Wayne Hameister ("Hameister") was a member of the Board from 1987 until 2012.

9. Richard Lindeman ("Lindeman") was President of the Bank and a member of the Board from 1998 until 2010.

10. Donald Olivieri, Jr. ("Olivieri") was a member of the Board from 1994 until 2012.

11. David Zeglis ("Zeglis") was Chairman of the Board from 1997 until 2010.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*; 12 U.S.C. §§ 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.

13. This Court has personal jurisdiction over Defendants who were, at all relevant times, residents of and/or conducted business in the State of Illinois. 735 ILCS §§ 5/2-209(a)(1) and (2).

14. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and/or omissions giving rise to the claims and causes of action asserted in this Complaint occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

### A. Background

15.     First United was established in 1972 as a community bank located in Will County, Illinois.  Beginning in 2003 and extending to early 2009, Defendants embarked on an overly aggressive growth program for the Bank that included high risk credit facilities.  Defendants failed to adequately staff the Bank to properly underwrite and oversee the Bank's rapidly expanding and increasingly complex loan portfolio with any increase in lending or credit administration staff, and failed to protect depositors from the risks inherent in the growing portfolio by implementing appropriate controls in the lending process.

16.     Defendants ignored proper credit risk management and failed to engage in underwriting practices necessary to ensure that the growth of the Bank's loan portfolio was accomplished safely.  Defendants' disregard for underwriting standards was exemplified by their approval of the Subject Loans, which were made despite a lack of crucial information about each loan and in the face of underwriting deficiencies clear from loan presentations.

17.     Defendants' reckless lending practices led to a significant increase in classified assets at the Bank.  By March 31, 2009, adversely classified assets totaled over $73 million.  The Bank was unable to recover from the resulting losses.

### B. The Loan Policy and Approval Process at First United Bank

18.     During all relevant times, the Bank had a Loan Policy that specified a goal of eliminating high risk loans at the Bank.  The Loan Policy further listed the following loans as "undesirable":

- loans secured by closely held stock that may not be readily marketable;

- speculative construction loans of all types where the primary source of repayment is the sale or refinance of the property; and

4

- working capital loans to new businesses that are not well secured.

The Loan Policy also required that loans to business borrowers required a debt service coverage ("DSC") ratio of at least 1.25.

19. Under First United's lending practices, CLO Borowski had an individual lending authority of $500,000 on commercial loans. Other lending officers had lower individual lending authority. Borowski reported directly to Chairman Zeglis, who, although he had no official officer title at the Bank, drew a salary from the Bank commensurate with the Bank's executive officers. Any loans exceeding the lending authority of any lending officer required the approval of the Bank's Loan & Discount ("L&D") Committee, which comprised Defendants Gorman, Hameister, Lindeman, Olivieri, and Zeglis.

20. Borowski, as CLO, approved seven of the Subject Loans, and the L&D Committee approved all ten of the Subject Loans. With respect to several of the Subject Loans, Defendants knew or should have known that they did not have the facts needed to make an informed decision. With respect to other Subject Loans, there were facts made available to the Defendants that indicated that the loans should not have been made. As to each Subject Loan, the Defendants knew or should have known that the proposed loan violated the Loan Policy and/or prudent lending practices.

C.    **Defendants' Tortious Approvals that Caused the Bank Losses**

21. The Subject Loans consist of ten loans approved from September 2007 to February 2009. The Subject Loans violate multiple provisions of the Bank's Loan Policy and safe and sound banking practices, including incomplete borrower and guarantor financial information, inadequate DSC ratios, and insufficient collateral.

1.    **Loans to Borrower JMR Management**

a.    **September 2007 Loan**

22.    On September 11, 2007, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved an $838,825 loan to JMR Management LLC ("JMR"), an owner and manager of low to moderate income residential rental properties and commercial properties.   The purpose of the loan was to refinance lines of credit JMR had at First United and another bank, which were collateralized by 11 residential and 2 commercial properties.  The loan funded on October 26, 2007.

23.    The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan to JMR because they, among other things:

a.    Approved the loan despite the fact that the loan presentation lacked critical and timely financial information about the borrower; specifically, the loan presentation did not include any financial statements for the borrower, JMR, contrary to Loan Policy requirements.

b.    Approved the loan even though the limited financial information contained in the loan presentation raised substantial red flags about JMR's ability to repay the loan.  The loan presentation and supporting information revealed that the borrower had total income of only $266 in 2006.

c.    Approved the loan even though information supporting the loan presentation raised questions about the accuracy of the global cash flow analysis included in the loan presentation.  The global cash flow analysis calculated DSC at 1.77 based upon total rents of $1,066,586, even though JMR had total gross rents of only $282,264 in 2006 and a net rental income of negative $119,509.

d.    Approved the loan despite the fact that the loan presentation revealed that the guarantors on the loan had a debt to income ratio ("DTI") of 45.92 percent, which exceeded the Bank's guideline of a maximum 40.00 percent DTI.

24.    The FDIC-R seeks damages in excess of $541,000 caused by Defendants' tortious approval of the September 2007 loan to JMR.

### b.    <u>September 2008 Loan</u>

25.    In September 2008, Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved a loan for $345,600 to JMR. The purpose of the loan was to purchase three residential properties, the mortgages and assignments of rent on which served as collateral for the loan.

26.    The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan to JMR because they, among other things:

a.    Approved the loan without a written or oral loan presentation made to the Loan & Discount Committee, in violation of the Loan Policy requirement to engage in sound credit analysis prior to the approval of all commercial and real estate loans.

b.    Approved the loan even though the limited financial information in the Bank's loan file raised substantial red flags about JMR's ability to repay the loan. JMR's net worth in 2007 was only $58,707, and the guarantors had a negative net income in 2007.

c.    Approved the loan, on information and belief, without obtaining necessary information on the collateral. Had the Defendants obtained that information, they would have learned that rents collectible on the underlying collateral yielded a DSC of 1.14, below First United's minimum DSC of 1.25.

7

27.     The FDIC-R seeks damages in excess of $271,000 caused by Defendants' tortious approval of the September 2008 loan to JMR.

c.     **February 2009 Loans**

28.     On February 10, 2009, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved additional funding on two separate loans to JMR.  The first loan was for $979,000, $154,000 of which was new funds for the purpose of tenant improvements on one of the properties that served as collateral on the loan. The second loan was for $593,000, $300,000 of which was new funds for the purpose of: making improvements on one of the commercial properties that served as collateral on the loan; completing improvements on several residential units to add them to JMR's rent rolls; paying taxes on several properties; and covering operating expenses and reserve.

29.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving the $154,000 increase of funds to JMR because they, among other things:

a.     Approved the loan increase despite the fact that the loan presentation lacked critical and timely financial information about the borrower; specifically, the loan presentation did not include any financial statements for the borrower, JMR, contrary to Loan Policy requirements.

b.     Approved the loan increase even though the limited financial information in the Bank's loan file raised substantial red flags about JMR's ability to repay the loan. JMR's net worth in 2007 was only $58,707.  The loan presentation did not include net worth information for JMR more current than year-end 2007.

c.     Approved the loan increase without sufficiently analyzing the source of repayment. The DSC derived from the rental of the property serving as collateral was .78 before improvements and .92 after improvements, both well below First United's 1.25 minimum DSC.

d.     Approved the loan increase despite lacking critical information regarding the underlying collateral. The L&D Committee waived an earlier imposed condition requiring the Bank to obtain an appraisal of at least $1,090,000 on one of the properties serving as collateral on the loan. The most recent appraisal of that property in the Bank's loan file valued the property at $1.1 million in 2004; the deterioration in the local real estate market between 2004 and 2009, when the increase was approved made it unlikely that the property retained the requisite value.

30.     The FDIC-R seeks damages in excess of $68,000 caused by Defendants' tortious approval of the increase of $154,000 in funds to JMR on this loan.

31.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving the $300,000 increase of funds to JMR because they, among other things:

a.     Approved the loan increase despite the fact that the loan presentation lacked critical and timely financial information about the borrower; specifically, the loan presentation did not include any financial statements for the borrower, JMR, contrary to Loan Policy requirements.

b.     Approved the loan increase even though the limited financial information in the Bank's loan file raised substantial red flags about JMR's ability to repay the loan.

9

JMR's net worth in 2007 was only $58,707. The loan presentation did not include net worth information for JMR more current than year-end 2007.

c.    Approved the loan increase despite financial information raising questions about the guarantors' ability to repay the loan. The individual guarantors' credit scores were fair to poor and had dropped considerably from the previous year.

d.    Approved the loan increase without sufficiently analyzing the source of repayment. The DSC derived from the rental of the property serving as collateral, based on current rents, was .584, well below First United's 1.25 minimum DSC.

32.    The FDIC-R seeks damages in excess of $236,000 caused by Defendants' tortious approval of the increase of $300,000 in funds to JMR on this loan.

**2.    <u>Borrower Grand Central Properties</u>**

33.    On March 11, 2008, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D committee approved a $3.74 million loan participation in another bank's $7.7 million loan to Grand Central Properties LLC, a real estate development company located in Stillwater, Minnesota. The purpose of the loan was to refinance a condominium and town home development in Columbia Heights, Minnesota.

34.    The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan because they, among other things:

a.    Approved the loan despite the fact that the borrower and underlying collateral were well outside of the Bank's primary trade area, which the Loan Policy defined as Cook, DuPage, Kane, Kankakee, and Will Counties in Illinois, and Lake County in Indiana.

b.   Approved the loan even though they knew it was a speculative construction loan and the primary source of repayment was the sale of the property, which made it an undesirable loan according to the Bank's Loan Policy.

c.   Approved the loan despite the fact that the loan presentation lacked critical and timely financial information about the borrower; specifically, the loan presentation did not include any financial statements for the borrower, Grand Central Properties, contrary to Loan Policy requirements.

d.   Approved the loan even though the limited financial information in the Bank's loan file raised substantial red flags about Grand Central Properties' ability to repay the loan.  Grand Central Properties operated at a loss of $2.6 million in 2007.

e.   Approved the loan without sufficiently analyzing the sources of repayment.  The loan presentation projected sales for 2008 and 2009 of $5,339,200 on the condominium units, despite the fact that the project had sales of only $982,401 in 2007.  In addition, the sales projections for 2008 and 2009 were overstated by at least $964,200 based on reported appraised values for the condominium units.

f.   Approved the loan despite an over-reliance on collateral as a source of repayment. All principal payments were to be made from sale of the condominium units, town home lots, and condo building pads, and the appraisal report indicated that, "Supply is greater than average and demand has slowed causing longer market times and reduced prices."

g.   Approved the loan even though the loan to value ratio was 80 percent, in violation of First United policy and regulatory guidance of 75 percent LTV.

35.     The FDIC-R seeks damages in excess of $166,000 caused by Defendants' tortious approval of the loan to Grand Central Properties.

**3.     <u>Borrower Stead Corporation</u>**

36.     In May 2008, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved a $560,000 loan to Stead Corporation, a start-up corporation formed for the purpose of acquiring an Aurelio's Pizza franchise restaurant. The purpose of the loan was to fund the purchase of the restaurant.

37.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan because they, among other things:

a.      Approved the loan without a written loan presentation made to the Loan & Discount Committee, in violation of the Loan Policy requirement to engage in sound credit analysis prior to the approval of all commercial and real estate loans.

b.      Approved the loan even though they knew that working capital loans to new businesses that are not well secured were identified as undesirable loans in the Bank's Loan Policy.

c.      Approved the loan knowing that the seller, also a borrower of the Bank, had not had success with this business and had filed for bankruptcy.

d.      Approved the loan despite the fact that the Bank's loan file lacked critical and timely financial information about the borrower; specifically, the loan file did not include any financial statements for the borrower, Stead Corporation, contrary to Loan Policy requirements.

e.      Approved the loan even though the loan to value ratio, based on the reported value of $850,000 for the collateral underlying the loan was 110 percent, and

based on the actual appraised value of the collateral of $825,000 was 115 percent, both in violation of First United policy and regulatory guidance of 75 percent LTV.

f.     Approved the loan even though the guarantors lacked demonstrated ability to repay the loan.  The principal of Stead Corporation and the members of his family who guaranteed the loan had a combined income for 2007 of negative $66,483.

38.     The FDIC-R seeks damages in excess of $436,000 caused by Defendants' tortious approval of the loan to Stead Corporation.

**4.     Borrower The Insurance Store**.

39.     On June 24, 2008, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee [1] approved a $540,100 loan to The Insurance Store Regional Agency, Inc. ("The Insurance Store").  The purpose of the loan was to refinance a loan from Brook Corporation and to obtain interest rate relief.

40.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan because they, among other things:

a.     Approved the loan without a written loan presentation made to the Loan & Discount Committee, in violation of the Loan Policy requirement to engage in sound credit analysis prior to the approval of all commercial and real estate loans.

b.     Approved the loan despite the fact that the Bank's loan file lacked critical and timely financial information about the borrower; specifically, the loan file did not include any financial statements for the borrower, The Insurance Store, contrary to Loan Policy requirements.

_____

[1]  Gorman was absent from the L&D Committee meeting on the day this loan was approved.

c.    Approved the loan, on information and belief, without obtaining necessary financial information from the borrower.  Had the Defendants obtained that information, it would have raised substantial red flags about The Insurance Store's ability to repay the loan.  Financial information obtained by the Bank after the loan was approved showed that The Insurance Store had income of only $6,964 in 2007 and a negative net worth of $220,052.

d.    Approved the loan, on information and belief, without obtaining necessary financial information from the guarantors.  Had the Defendants obtained that information, it would have showed that the guarantors lacked demonstrated ability to repay the loan.   The principal of The Insurance Store and his wife had income in 2007 of only $88,000 and a net worth of $43,506.

41.    The FDIC-R seeks damages in excess of $100,000 caused by Defendants' tortious approval of the loan to the Insurance Store.

**5.    <u>Borrower HomeStar Financial</u>**

42.    On July 8, 2008, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved a $5 million loan to HomeStar Financial Group Inc. ("HomeStar").  The purpose of the loan was to inject capital into HomeStar's subsidiary, HomeStar Bank ("HSB").

43.    The HomeStar loan was originally approved as a loan secured by HSB stock.  The loan was documented and funded, however, as an unsecured Subordinated Debenture Purchase Agreement.  Borowski and Zeglis were directly involved in the negotiation and documentation of the HomeStar loan.

14

44.     On June 23, 2009, CLO Borowski and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee, approved the HomeStar loan *ex post facto*, as an unsecured loan.

45.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan on July 8, 2008, because they, among other things:

a.      Approved the loan without a written loan presentation made to the Loan & Discount Committee, in violation of the Loan Policy requirement to engage in sound credit analysis prior to the approval of all commercial and real estate loans.

b.      Approved the loan despite the fact that the collateral for the loan was shares of common stock of HSB and the Bank's Loan Policy declared loans secured by closely held stock "undesirable."

c.      Approved the loan without sufficiently analyzing the sources of repayment.  At the time of the loan's approval, HomeStar had previously issued two pools of trust preferred securities that obligated it to pay approximately $1.4 million in interest per year in addition to the interest on the First United subordinated debt.

d.      Approved the loan without analyzing the stated need for the loan.  HSB reported net income of $5.363 million in 2007, but HomeStar stripped $4.490 million of that net income as a cash dividend on its common stock, thereby creating need for a capital infusion to HSB.  At the time of the loan approval, HSB had a Tier One leverage capital ratio of 7.75 percent, in the lowest 20th percentile of its peer group banks.

46.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan *ex post facto* on June 23, 2009, because they, among other things:

    a.    Approved the loan despite the fact that the Bank's loan file lacked critical and timely financial information about the borrower.  The financial information presented to the L&D Committee was for the subsidiary bank, HSB, as of March 31, 2008, even though more up-to-date financial information was publicly available.  For the quarter ended December 31, 2008, HSB posted a loss of $.381 million.  Had Defendants inquired, they would have also learned that HomeStar reported a loss of $2.249 million for 2008.

    b.    Approved the loan despite the fact that the written loan presentation did not include a complete global cash flow analysis, and the Bank had been criticized in the most recent Report of Examination ("RoE") by the FDIC for failing to conduct such analyses.

47.     On May 19, 2010, HSB entered into a Consent Order with the FDIC, which prohibited the bank from declaring or paying a dividend without prior written consent of the FDIC.

48.     HomeStar defaulted on its obligation to First United in August 2010.

49.     The FDIC-R seeks damages in excess of $4.585 million caused by Defendants' tortious approval of the loan to HomeStar.

**6.     Borrower First Personal Financial**

50.     On August 12, 2008, Borowski as CLO and Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved a $2.5 million loan to First

Personal Financial Corporation ("First Personal").  The purpose of the loan was to infuse capital into First Personal's subsidiary, First Personal Bank ("FPB").

51.     The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan because they, among other things:

a.      Approved the loan despite the fact that the collateral for the loan was shares of common stock of FPB and the Bank's Loan Policy declared loans secured by closely held stock "undesirable."

b.      Approved the loan despite the fact that the Bank's loan file lacked critical and timely financial information about the borrower; specifically, the loan file did not include any financial statements for the borrower, First Personal, contrary to Loan Policy requirements.

c.      Approved the loan even though the inadequate financial information contained in the loan presentation raised substantial red flags regarding the borrowers' ability to repay the loan.  The stated source of repayment for the loan was cash flow from the ongoing operations of FPB.  However, the loan presentation revealed that the DSC was well below First United's 1.25 minimum:  "The bank's net income average over the past 9 quarters (27 months) is a negative $4,074 per month.  This covers our debt service by -2.05 times."

d.      Approved the loan, on information and belief, without obtaining adequate financial information about FPB.  Had the Defendants obtained that information, they would have learned that the most recent publicly available financial information about FPB showed that its net income had fallen from negative $80,000 to negative $95,000 from the previous quarter.

52. On March 30, 2010, FPB entered into a Consent Order with the FDIC, which prohibited the bank from declaring or paying a dividend without prior written consent of the FDIC.

53. First Personal defaulted on its obligation to First United in May 2010.

54. The FDIC-R seeks damages in excess of $842,000 caused by Defendants' tortious approval of the loan to First Personal.

**7.** **Borrower Trim Creek**

55. On October 21, 2008, Gorman, Hameister, Lindeman, Olivieri, and Zeglis as members of the L&D Committee approved a $1.606 million loan to Trim Creek, LLC ("Trim Creek"), a subsidiary of the Bank created to purchase shares of stock of Brooke Corporation ("BC"), held by Brooke Holdings, Inc., a borrower of First United that had defaulted on approximately $15 million in obligations.

56. The Bank's strategy was to cause Trim Creek to purchase the BC stock, wage a proxy battle for control of BC, remove the current management, and eventually recoup its losses from the loans to Brooke Holdings, Inc. The Bank loaned Trim Creek the funds to purchase the BC stock.

57. Trim Creek purchased 6,425,000 shares of BC at a UCC sale for .25 per share, for a total of $1,606,250. Trim Creek retained 50 percent ownership of the BC stock, and sold 30 percent to Farmers Bank & Trust and 20 percent to Indigo Investments.

58. Within weeks of Trim Creek's purchase of the BC stock, BC filed for bankruptcy and Trim Creek never waged the proxy battle.

59. The Defendants acted negligently, grossly negligently, and in breach of their fiduciary duties in approving this loan because they, among other things:

a. Approved the loan despite the fact that the collateral for the loan was closely held shares of common stock of BC and the Bank's Loan Policy declared loans secured by closely held stock "undesirable."

b. Approved the loan even though the loan violated Section 23A(c)(1)(D) of the Federal Reserve Act governing transactions with affiliates. The Federal Reserve Act's applicable regulations required that, for loans secured by stock, the stock must have a market value of at least 130 percent of the loan balance. The Trim Creek loan was secured by stock with a market value of 100 percent of the loan balance.

60. First United charged off the Trim Creek loan in June 2009.

61. The FDIC-R seeks damages in excess of $803,000 caused by Defendants' tortious approval of the loan to Trim Creek.

**CLAIMS FOR RELIEF**

**COUNT I**
**Negligence (Illinois law)**
**In the Alternative to Count III**

62. Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 61 of this Complaint, as though fully set forth herein.

63. By their actions and inactions, Defendants were negligent in failing to perform their respective duties with the requisite degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances.

64. Defendants owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including but not limited to the following: (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those

loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

65.     Defendants were negligent by their actions and inactions, including but not limited to the following:  (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving the Subject Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did not violate applicable banking laws and regulations; and (g) approving the Subject Loans without proper analysis of the borrower's ability to satisfy the debt.

66.     As a direct and proximate result of Defendants' negligence, the FDIC-R seeks damages in an amount to be proven at trial in excess of $8.05 million.

**COUNT II**
**Gross Negligence – Violation of 12 U.S.C. §1821(k)**

67.     Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 66 of this Complaint, as though fully set forth herein.

68.     Section 1821(k) of Financial Institutions Reform, Recovery and Enforcement Act holds directors or officers of financial institutions personally liable for damages caused by their "gross negligence," as defined by applicable state law.  Illinois law defines gross negligence as "very great negligence," but something less than willful, wanton, and reckless conduct.

69.     Defendants owed a duty to use reasonable care, skill, and diligence in the performance of their duties, including but not limited to the following:  (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

70.     Defendants were grossly negligent by their actions and inactions, including but not limited to the following:  (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving the Subject Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did not violate applicable banking laws and regulations; and (g) approving the Subject Loans without proper analysis of the borrower's ability to satisfy the debt.

71.     As a direct and proximate result of Defendants' gross negligence, the FDIC-R seeks damages in an amount to be proven at trial in excess of $8.05 million.

### COUNT III
### Breach of Fiduciary Duty (Illinois law)
### In the Alternative to Count I

72.     Plaintiff FDIC-R re-alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 71 of this Complaint, as though fully set forth herein.

73.     As directors and/or officers, Defendants owed the Bank fiduciary duties to act with the utmost care and in the best interests of the Bank, including but not limited to the following:  (a) informing themselves about proposed transactions and their risks before approving them; (b) approving only those loans that conformed with the Loan Policy; (c) ensuring that any loans they approved were underwritten in a safe and sound manner; (d) ensuring that any loans they approved were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) ensuring that any loans they approved were made to creditworthy borrowers; and (f) ensuring that any transactions they approved did not violate applicable banking laws and regulations.

74.     Defendants breached their fiduciary duties by their actions and inactions, including but not limited to the following:  (a) failing to inform themselves about the Subject Loans and their risks before approving them; (b) approving the Subject Loans on terms that violated the Loan Policy; (c) failing to ensure that the Subject Loans were underwritten in a safe and sound manner before approving them; (d) failing to ensure that the Subject Loans were secured by sufficiently valuable collateral and guarantees in order to prevent or minimize risk; (e) approving Subject Loans to borrowers who were not creditworthy; (f) failing to ensure that the Subject Loans did not violate applicable banking laws and regulations; and (g) approving the Subject Loans without proper analysis of the borrower's ability to satisfy the debt.

75.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the FDIC-R seeks damages in an amount to be proven at trial in excess of $8.05 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the FDIC as Receiver for First United Bank, requests entry of

judgment in its favor and against Defendants as follows:

      a.      For compensatory damages of at least $8.05 million, and any excess

              amount as may be proved at trial, with each Defendant found jointly and

              severally liable for the losses on the Subject Loans he approved;

      b.      For its cost of suit against all Defendants;

      c.      For prejudgment interest;

      d.      For attorneys' fees and costs for the investigation and litigation; and

      e.      For such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, the FDIC-R requests a trial by jury on all

claims.

              Respectfully submitted,

              **FEDERAL DEPOSIT INSURANCE**
              **CORPORATION AS RECEIVER FOR**
              **FIRST UNITED BANK**

Dated: June 15, 2016        By:     /s/ Cynthia H. Hyndman
                     One of its Attorneys

Cynthia H. Hyndman
Lydia A. Bueschel
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
(312) 663-3100 – Telephone
(312) 663-0303 – Facsimile
chyndman@robinsoncurley.com
lbueschel@robinsoncurley.com